## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MOHAMMAD "MOE" DIAB, and | ) | CRIMINAL NO. 1:19-cr-00374 (RDM) |
| RANI EL-SAADI, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

### UNITED STATES' TRIAL MEMORANDUM

### I.    RELEVANT BACKGROUND

#### A.    Facts

On November 7, 2019, the grand jury returned an Indictment charging eight defendants, including Mohammad "Moe" Diab and Rani El-Saadi,[1] with conspiracy to commit offenses against the United States, in violation of 18 U.S.C. § 371, and with making conduit campaign contributions, in violation of 52 U.S.C. §§ 30122 and 30109.  The Indictment also charged Diab with obstruction of justice, in violation of 18 U.S.C. § 1503.

#### 1.    The Conspiracy

Ahmad "Andy" Khawaja, the founder and chief executive officer of Allied Wallet, Inc., an online payment processing company based in Los Angeles, California, and George Nader, a purported representative of the United Arab Emirates (UAE) government, coveted political influence in the United States.  In Khawaja's case, he sought to obtain that influence in the hopes of securing political appointment in the future, and he used the funds he obtained from Nader to

---

[1] Although the Court indicated during a November 22, 2021, teleconference that it is considering continuing the trial of at least defendant Diab, no Order has been issued.  This trial memorandum therefore discusses a trial of Rani El-Saadi and Mohammad Diab.

make large campaign contributions, first to committees associated with one major presidential candidate (referenced in the Indictment as "Candidate 1," "Political Committee 2," and "Political Committee 5") in 2016, and then to committees associated with another major political party (referenced in the Indictment as "Political Committee 6" and "Political Committee 8") in 2017 and 2018, for that purpose.

In all, Nader sent approximately $4.9 million to Khawaja, who in turn funneled the funds, either through his own accounts or through associates, to committees associated with Candidate 1, and, after Candidate 1 lost the election, to committees associated with another political party. Because Khawaja quickly reached the legal limits of his ability to contribute, Khawaja funneled more than $1.8 million of the funds from Nader to his co-conspirators, including Diab and El-Saadi, for the purpose of making conduit, or "straw," contributions to the relevant committees.

Khawaja's quest for political influence was not confined to simply making contributions. In September 2016, Khawaja arranged to host a private fundraiser for Candidate 1 in Las Vegas, Nevada, which required him to contribute or to raise a minimum of $500,000—with an ultimate goal of $1 million—for political committees associated with that candidate.  But because Khawaja had previously reached the legal limits of his ability to contribute, Khawaja was required to raise funds from other contributors.  Instead of lawfully raising the money from other legitimate contributors, Khawaja worked with his associates—including El-Saadi and Diab—to make straw contributions of Nader's money, illegally, in their names.  As detailed below, Diab's straw contributions in connection with this event totaled $200,000; El-Saadi's straw contribution in connection with this event totaled $150,000.  As the evidence will show, these contributions were made at Khawaja's instruction and with funds that Khawaja provided to Diab and El-Saadi but that originated from Nader and the UAE.  The straw contributions entitled El-Saadi and Diab to

attend a private in-person event with Candidate 1 in Las Vegas, Nevada on October 12, 2016.  As the evidence will show, El-Saadi and Diab attended the small gathering with Candidate 1 along with Nader, Khawaja, and the other members of the conspiracy.

Candidate 1 ultimately lost the presidential election, so the co-conspirators shifted their primary focus to committees associated with another political party beginning in 2017.  Khawaja again worked with Diab and other co-conspirators to make straw contributions, thereby obscuring the true source of the funds.

### 2.    Diab's Straw Contributions

Diab was the chief operating officer of Allied Wallet at all times relevant to the charges and is Khawaja's cousin.  Twice in 2016, Diab made political contributions to a committee associated with Candidate 1 using money from Khawaja and Nader, in order to help Khawaja meet a minimum threshold necessary to host a private event with Candidate 1 while obscuring the true source of the funds.  On August 1, 2016, Khawaja used his personal bank account to pay Diab $196,000.  On the following day, Diab made a $100,000 political contribution to a joint fundraising committee[2] associated with Candidate 1.  On September 9, 2016, Khawaja again used his personal account to pay Diab $185,000, and on the same day, Diab made a $100,000 political contribution to Candidate 1.  A portion of Diab's contributions were routed by the joint fundraising committee to a political committee headquartered in Washington, D.C.

---

[2]    A joint fundraising committee is comprised of two or more political committees that join together to solicit contributions in the name of the joint fundraising committee, and then divide contributions made to that joint entity amongst the participating political committees. This allows multiple political committees to share fundraising costs and allows contributors to write a single contribution check, which is then transferred in shares to the participating political committees. In sum, a joint fundraising committee allows a donor to contribute to multiple committees with a single check. The contributions to the political committees under the joint fundraising committee are deemed to be from the original contributors, are reported in the contributors' names, and are credited against the contributors' contribution limits.

As the evidence will show, Diab also used funds provided to him by Khawaja to fund straw contributions made by other members of the conspiracy. For example, Diab issued a $50,000 check to Thayne Whipple on or about September 9, 2016, and another $50,000 check to Rudy Dekermenjian on or about October 7, 2016. Both Whipple and Dekermenjian used these funds to make straw contributions in connection with the Las Vegas event and attended the small gathering with Candidate 1 on October 12, 2016, alongside El-Saadi, Diab, Nader, Khawaja, and other members of the conspiracy.

After Candidate 1 lost the presidential election, Khawaja began to seek to influence the opposing party using straw contributions. On November 29, 2017, another of Khawaja's companies—E-Payment Solutions—wrote a $214,000 check to Diab's company, Goodlife Solutions. On the same day, Diab wrote a $100,000 check to the opposing party. And, on June 25, 2018, Diab wrote a $225,000 check to Political Committee 8 within days of Goodlife Solutions receiving a $225,000 check from E-Payment Solutions (check dated June 20, 2018). As a result of Diab's contribution to Political Committee 8, Khawaja and Diab were invited to an event featuring political leaders associated with this committee on June 18, 2018.

Diab also assisted Khawaja with other straw contributions and worked to conceal the true purpose of the money transfers. On October 7, 2016, Diab paid Dekermenjian $50,000 that came from Khawaja. On October 13, 2016, Dekermenjian wrote a $50,000 check to a joint fundraising committee associated with Candidate 1, and the payment posted on October 21, 2016. The check from Diab falsely states "watch" in the memorandum line, but there is no evidence that the funds were provided for a watch. On September 8, 2016, Whipple contributed $100,000 to a joint fundraising committee associated with Candidate 1. Half of those funds came to Whipple on September 8, 2016, from Khawaja through Diab, with the other half coming from Khawaja

4

directly.  An Allied Wallet email dated on or about September 13, 2016, includes a bank inquiry about a wire transfer from Allied Wallet to co-defendant Roy Boulos.  The payment was falsely recorded as a payment to an outside consultant.  Diab misrepresented to the bank that Boulos is "one of our resellers from Las Vegas who gets paid annually."  Contrary to Diab's representation, Boulos was a friend of Khawaja's who owned a liquor store in Las Vegas, was not a reseller for Allied Wallet, and used the aforementioned payment from Allied Wallet to make a $300,000 straw contribution to a joint fundraising committee associated with Candidate 1 to help Khawaja meet the fundraising threshold in connection with the Las Vegas event with Candidate 1, which Boulos attended along with other members of the conspiracy.

### 3.    El-Saadi's Straw Contribution

El-Saadi owns LAX Express Travel LLC, a luxury travel company based in Los Angeles, California that books luxury hotels, flights, exotic cars, and other travel services for travelers. During the time period relevant to the charges, Khawaja used LAX Express for luxury transport to and from the airport when he traveled, which cost $175.00 per transfer.  Additionally, LAX Express used the services of Allied Wallet for its online payment processing.

On September 9, 2016, Allied Wallet wire transferred approximately $148,965 to LAX Express.  On or about that same day, El-Saadi wrote a check in the amount of $150,000 to a joint fundraising committee associated with Candidate 1 to help Khawaja meet a minimum threshold necessary to host the aforementioned private event with Candidate 1.  The very next day, on or about September 10, 2016, El-Saadi transferred funds from his LAX Express bank account to his personal bank account in the amount of $150,000.  El-Saadi wrote the $150,000 check to the political committee affiliated with Candidate 1 from his personal bank account, which had a beginning balance of $13,473.04 for the month of September 2016 and an ending balance of $11,950.65.  Although El-Saadi's contribution check was dated September 9, 2016, the check

posted, and funds were withdrawn from El-Saadi's personal account, on September 21, 2016. A portion of El-Saadi's contribution went to and was processed by a political committee headquartered in Washington, D.C.

### 4. The Defendants' Efforts to Conceal Their Illegal Activity

In response to a subpoena, El-Saadi's travel business produced an invoice dated August 30, 2016, that purported to show that it charged Ahmad Khawaja $150,000 for "VIP Services . . . for 2016, 2017, [and] 2018." The invoice purports to account for the money that El-Saadi received from Khawaja on September 9, 2016, by characterizing it as part of a legitimate commercial transaction—a retainer, for three years of VIP services—and not with the expectation that El-Saadi would turn around and contribute $150,000 to a joint fundraising committee associated with Candidate 1 that very same day. The evidence will show that El-Saadi fabricated this false invoice in an attempt to conceal the illegal conduit contribution.

El-Saadi's effort to obscure the true purpose of the funds via the false invoice echoes the false statements that the other defendants, including Diab, made to the FBI. At trial, the government intends to highlight the endeavors of Khawaja and the co-conspirators to conceal the scheme. It will introduce evidence that Khawaja instructed members of the conspiracy as to what they should say about their contributions, if asked. Then, when these other members, including Diab, were interviewed by the FBI, they followed Khawaja's instructions and lied about the scheme.

### B. The Charges

The government intends to argue at trial that the facts set forth above prove beyond a reasonable doubt that both trial defendants are guilty of conspiracy in violation of 18 U.S.C. § 371 and making conduit campaign contributions, in violation of 52 U.S.C. §§ 30122 and 30109. These

facts will also prove that defendant Diab is guilty of obstruction of justice in violation of 18 U.S.C. § 1503.

### 1.     Count 13:  Conspiracy (18 U.S.C. § 371)

Seven defendants, including Mohammad "Moe" Diab and Rani El-Saadi, are charged in Count Thirteen with conspiracy to commit offenses against the United States, in violation of 18 U.S.C. § 371.  In deciding whether Diab and El-Saadi are guilty of Count Thirteen, the jury will be asked to determine if (1) an agreement existed between two or more people to commit the crime of making conduit campaign contributions (52 U.S.C. §§ 30122 and 30109), making excessive campaign contributions (52 U.S.C. §§ 30116 and 30109), causing false statements (18 U.S.C. § 1001), and causing false entries with the FEC (18 U.S.C. §1519), as alleged in the indictment; (2) the defendant intentionally joined in that agreement; and (3) one of the people involved in the conspiracy did something for the purpose of carrying out the conspiracy.  Criminal Jury Instructions for DC Instruction 7.102 (2021).[3]

### 2.     Counts 17, 18, and 33:  Making Conduit Campaign Contributions (52 U.S.C. §§ 30122 and 30109)

In 1971, Congress enacted the Federal Election Campaign Act ("FECA"), 52 U.S.C. § 30101 *et seq*., to "remedy any actual or perceived corruption of the political process."  *FEC v. Akins*, 524 U.S. 11, 14 (1998).  In pursuit of that goal, FECA imposes disclosure and reporting requirements on candidates for federal office, their campaign committees, and certain political committees, including by requiring the identification of individual contributors who contribute more than $200.  52 U.S.C. § 30104(b)(3)(a).  FECA also imposes limits on the amounts that individuals and organizations may contribute to a candidate for federal office, the candidate's

---

[3]     The elements of the offenses are described in more detail in the Government's Proposed Jury Instructions.  *See* Dkt. 149.

campaign committees, and certain political committees. *Id*. § 30116(a). And it further prohibits foreign nationals from making contributions "in connection with a [f]ederal, [s]tate, or local election." *Id*. § 30121(a)(1)(A). To prevent circumvention of these requirements, FECA provides that "[n]o person shall make a contribution in the name of another person or knowingly permit his name to be used to effect such a contribution, and no person shall knowingly accept a contribution made by one person in the name of another person." *Id*. § 30122.

In Count 18, the Indictment charges El-Saadi with making conduit campaign contributions, in violation of 52 U.S.C. §§ 30122 and 30109. In Counts Seventeen and Thirty-Three, the Indictment charges Diab with making conduit campaign contributions, in violation of 52 U.S.C. §§ 30122 and 30109. In deciding Counts Seventeen, Eighteen, and Thirty-Three, the jury will be asked to determine if (1) the defendant permitted his name to be used to effect a political contribution from Khawaja or caused a political committee to accept such a contribution; (2) that contribution aggregated at least $25,000 in one calendar year; and (3) the defendant acted willfully. 52 U.S.C. § 30122 (contribution in name of another) and § 30109(d)(1)(D) (criminal penalties). To sustain a conviction, the government must demonstrate that the defendants acted willfully, that is, that they knew generally that their conduct was unlawful. *Bryan v. United States*, 524 U.S. 184, 191-92 (1998); *see also United States v. Whittemore*, 944 F. Supp. 2d 1003, 1010 (D. Nev. 2013) ("[T]he government must prove that Whittemore knew his conduct violated some law, but it need not prove which one."); *United States v. Danielczk*, 788 F. Supp. 2d 472, 489-93 (E.D. Va. 2011) ("[T]he government must prove that Defendants intended to violate the law (whatever the law was); but it need not prove Defendants' awareness of the specific law's commands."), *overruled on other grounds by United States v. Danielczyk*, 683 F.3d 611 (4th Cir. 2012).

8

### 3.      Count 50:  Obstruction (18 U.S.C. § 1503)

The Indictment also charges Diab with obstruction of justice, in violation of 18 U.S.C. § 1503.  In deciding Count Fifty, the jury will be asked to determine if (1) there was a proceeding pending before a federal grand jury; (2) the defendant knew of the pending judicial proceeding; (3) he endeavored to influence, obstruct, and impede the due administration of justice in that proceeding; and (4) the defendant's act was done "corruptly," that is, the defendant acted knowingly and dishonestly, with the specific intent to subvert or undermine the due administration of justice.  Model Crm. Jury Instr. 5th Cir. No. 2.63.[4]

### C.      The United States' Evidentiary Presentation

At trial, the witnesses that the government intends to call include (1) an FBI forensic accountant and FBI Special Agent who will present documentary evidence chronicling the trial defendants' and their co-conspirators' conduit contributions; (2) trial defendants' co-conspirators who pled guilty to their participation in the conduit contribution conspiracy; (3) Khawaja's political advisor who was present for certain events related to the scheme; (4) Allied Wallet's Chief Financial Officer; (5) Diab's accountant; (6) El-Saadi's brother, Wael El-Saadi;[5] (7) political committee representatives; and (8) a representative from the FEC.[6]  To prevent in-trial delay due

---

[4]      The 2021 Criminal Jury Instructions for D.C. provide a pattern jury instruction for Obstructing the Due Administration of Justice at Instruction 6.101; however, that instruction omits reference to the requirement that defendant's act was done "corruptly."  We have therefore included the Fifth Circuit Model Criminal Jury Instruction for this charge.

[5]      The government call Rani El-Saadi's brother, Wael El-Saadi; however, Wael El-Saadi's counsel also represent defendant Rani El-Saadi, creating a potential conflict of interest.  As of the filing of this Memorandum, Rani and Wael El-Saadi's defense counsel have not responded to the government's inquiry into whether they still represent Wael El-Saadi.  This conflict of interest is a significant issue, and it is one that defense counsel has yet to resolve despite the Court's clear admonishment at the November 22, 2021 hearing in this matter to defense counsel that the issue be addressed expeditiously.

[6]      The government reserves the right to supplement the evidence described herein.  The government does not guarantee that it will call every witness described or present every piece of

to objections that can be resolved before trial begins, below we address the admissibility of the government's documentary evidence as well as the manner in which we intend to present that documentary evidence.

### 1.    Documentary Evidence

Bank records will show each conduit contribution from Nader to Khawaja, through the trial defendants and co-conspirators, to the recipient committees, and ultimately as falsely reported to the FEC.  Documentary evidence will show that Khawaja contributed millions of dollars that originated from Nader and the UAE.  Those funds were contributed to political committees affiliated with Candidate 1 either directly or through conduits, and, once Candidate 1 lost the presidential election, the defendants funneled contributions to the opposing party.  This evidence will include records of the contributions by Diab and El-Saadi as well as the advancements or reimbursements from Khawaja.  Bank records will also include payments for contributions that Khawaja funneled through Diab who delivered the funds to co-conspirators, who ultimately contributed the funds to a committee associated with Candidate 1.  The government will call an FBI forensic accountant and/or special agent to testify about the financial records that they reviewed in this case.  FEC records will also provide evidence of the conduit contributions.

The admissibility of documentary evidence like this involves three questions: first, whether the document contains relevant evidence; second, whether the document is authentic—*i.e.*, whether it is what it purports to be; and third, whether the statements contained within the document are non-hearsay or excepted from hearsay, and therefore admissible.  The records' relevance, broadly speaking, is explained above.  Below, we explain how we intend to authenticate these records and why they are not hearsay.

---

evidence described herein.  Should this Court sever defendants El-Saadi and Diab, that ruling will affect the presentation of evidence.

### a.     *Authentication*

To authenticate a document, such as an email or other record, the proponent "must produce evidence sufficient to support a finding [by the jury] that the item is what the proponent claims it is." Fed. R. Evid. 901(a). The threshold for authenticity is "not high" and the proponent's burden is "slight"; the proponent is not required "to rule out all possibilities inconsistent with authenticity, or to prove beyond any doubt that the evidence is what it purports to be." *United States v. Hassanshahi*, 195 F. Supp. 3d 35, 48 (D.D.C. 2016) (citations and quotation marks omitted); *see also United States v. Safavian*, 435 F. Supp. 2d 36, 39 (D.D.C. 2006) ("[T]he Court need not find that the emails are necessarily what the proponent claims, only that there is evidence sufficient for the jury to make such a finding.") (citation omitted). Authenticity can be established through testimony from a witness with knowledge that "an item is what it is claimed to be," Fed. R. Evid. 901(b)(1), by examining the item's "appearance, contents, substance, internal patterns, or other distinctive characteristics . . ., taken together with all the circumstances," Fed. R. Evid. 901(b)(4), and other methods. Absent evidence of alterations or specific indicia that a document is not what it purports to be, arguments about its reliability or trustworthiness are "more appropriately directed to the weight the jury should give the evidence," not to whether it should be admitted. *Safavian*, 435 F. Supp. 2d at 41; *see also Hassanshahi*, 195 F. Supp. 3d at 48 ("The ultimate resolution of the evidence's authenticity is reserved for the jury.").

The majority of records the government intends to offer at trial were obtained through grand jury subpoenas and voluntary disclosure by the FEC. Such documents are readily authenticable through testimony by a law enforcement agent with knowledge of the collection process. *See Braswell v. United States*, 487 U.S. 99, 118 (1988) (explaining that the government may authenticate records through testimony "establishing that the corporation produced the records subpoenaed," and the "jury may draw from the corporation's act of production the

11

conclusion that the records in question are authentic corporate records, which the corporation possessed, and which it produced in response to the subpoena").  Although such testimony is itself sufficient to authenticate records, the authenticity of communications such as emails and correspondence will be further confirmed by their content, including the email addresses, the subject of their communications, and other contextual information.  *See Safavian*, 435 F. Supp. 2d at 39-40 (authenticating emails based on the email addresses connecting names to accounts, signature blocks identifying the sender, the communications' content, and comparison to other admitted records).

For example, in response to a grand jury subpoena, El-Saadi's travel business produced an invoice dated August 30, 2016, that purported to show that it billed Khawaja for $150,000 for "VIP Services" from 2016 through 2018.  The invoice purports to account for the money that El-Saadi received from Khawaja on September 9, 2016, by falsely characterizing it as part of a legitimate commercial transaction—a retainer, for three years of VIP services—and not with the expectation that El-Saadi would contribute $150,000 to a joint fundraising committee associated with Candidate 1 that same day.  The government plans to authenticate this invoice through the case agent.  The invoice was produced by El-Saadi's former counsel, Harland Braun, who now represents Diab.

In addition, many of the records the government will introduce at trial, including bank records, have a certification under Federal Rule of Evidence 902(4) or (11), which render the records self-authenticating.

###### b.      Admissibility–Business and Public Records

The government will introduce business records, such as bank and political committee records.  Federal Rule of Evidence 803(6) excepts from hearsay "[r]ecords of a [r]egularly [c]onducted activity," such as "[a] record of an act [or] event," if the record: "(A) was made at or

near the time by—or from information transmitted by—someone with knowledge; (B) . . . was kept in the course of a regularly conducted activity of a business . . . ; [and] (C) making the record was a regular practice of that activity . . . ."

A business record is admissible without testimony from a custodian upon "a certification that complies with Rule 902(11)," Fed. R. Evid. 803(6)(D), and if "the record and certification [are made] available for inspection—so that the [opponent] has a fair opportunity to challenge them." Fed. R. Evid. 902(11); *see Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 324 (2009) ("Business and public records are generally admissible absent confrontation not because they qualify under an exception to the hearsay rules, but because—having been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial—they are not testimonial."). The categories of records listed below fall squarely within Rule 803(6)'s confines, and the defense has an opportunity to raise any concern, question, or objection to their authentication using Rule 902(11) certifications before trial:

| Description | Exhibit # | Exhibit # of Certification |
|---|---|---|
| Bank of America Records | 1 | 1V |
| Amalgamated Bank Records | 2 | 2E |
| Wells Fargo Bank Records | 5 | 5E |
| JP Morgan Bank Records | 6 | 6D |
| Bank of the Sierra/Ojai Community Bank Records | 14 | 14A |
| Hillary Victory Fund Records | 12 | Forthcoming |
| Golden State Bank Records | 40 | 40A |
| Diab Tax Records | 84 | 92 |

If the defense has any objection to the admission of records listed above using the 902(11) certifications, the government requests that the defense raise it on or before Thursday, December 2, 2021.

The government also intends to admit Federal Election Commission (FEC) reports using a Fed. R. Evid. 902(4)(A) certificate.  A public record is self-authenticating under Federal Rule of Evidence 902(4)(A) if the copy is certified as correct by "the custodian or another person authorized to make the certification."  Fed. R. Evid. 902(4)(A).  To satisfy the requirements of Rule 902(4), "a certification need only identify the legal custodian's position of authority, and that the copy is true and correct."  *United States v. McGee*, 439 F. App'x 837, 839 (11th Cir. 2011) (citation omitted).  The records listed below fall squarely within Rule 803(6)'s confines, and the defense has an opportunity to raise any concern, question, or objection to their authentication using a Rule 902(4)(A) certification before trial:

| Description | Exhibit | Ex. No. of Certification |
|---|---|---|
| Federal Election Commission Reports | 3, 4, 7, 8, 9, 11, 15, 16, and 95 | 91 |

If the defense has any objection to the admission of records listed above using the 902(4)(A) certification, the government requests that the defense raise it on or before Thursday, December 2, 2021.

### c.    *Summary Exhibits*

Most of the financial evidence, including bank records, will be presented through the testimony of an FBI forensic accountant and/or the case agent.  To help the jury understand the documentary financial evidence, the government will use summary exhibits to demonstrate the flow of money and sum up conduit payments.  (Preliminary summary exhibits have been disclosed

to the defense as part of the government's exhibit list and will be finalized before trial begins.) Summary charts are admissible under Federal Rule of Evidence 1006, which allows their use "to prove the content of voluminous writings [or] recordings . . . that cannot be conveniently examined in court." *see also United States v. Hemphill*, 514 F.3d 1350, 1359 (D.C. Cir. 2008) ("The point of Rule 1006 is to avoid introducing all the documents. As long as a party has laid a foundation for the underlying documents, a chart summarizing them can itself be evidence under Rule 1006."). Courts routinely permit the use of such summary charts where, as here, their use will assist the jury's understanding of the evidence and expedite trial. *See, e.g.*, *United States v. Fahnbulleh*, 752 F.3d 470, 479 (D.C. Cir. 2014).

### d.    *Diab's False Statement to the FBI*

The government plans to introduce Diab's false statements to the FBI, including that he denied making conduit contributions for Khawaja. The government will also introduce evidence that Diab confirmed to the FBI that he knew that there was "a rule" against making contributions in the name of another. The statements are admissible against Diab as a statement by a party-opponent pursuant to Federal Rule of Evidence 801(d)(2)(A). Diab's false statements to the FBI also will not be offered for the truth of any matter asserted, as they are false. Diab's false statements were made in an attempt to conceal his illegal scheme with Khawaja. Because the statements relate strictly to Diab's arrangement with Khawaja and do not directly or indirectly identify or refer to El-Saadi, they do not pose any Sixth Amendment Confrontation Clause concern for him. *See, e.g.*, *United States v. Clarke*, 767 F. Supp. 2d 12, 32-33 (D.D.C. 2011) ("*Bruton* is limited to statements that facially incriminate a co-defendant—either because the statement is directly accusatory, contains an obvious pointer to the non-declarant codefendant, or invites a direct and immediate inference of a co-defendant's guilt.").

### e.      Admissibility–Emails

The government will introduce into evidence certain emails.  For example, in one email exchange, Diab lied to a bank to cover up another conduit contribution by Khawaja through co-defendant Boulos.  An Allied Wallet email dated on or about September 13, 2016, includes a bank inquiry about a wire transfer from Allied Wallet to Boulos.  The payment was recorded as a payment to an outside consultant.  Diab responded to the bank that Boulos is "one of our resellers from Las Vegas who gets paid annually."  Contrary to Diab's representation, Boulos was a friend of Khawaja who owned a liquor store and was not a reseller for Allied Wallet.

These emails are admissible under Federal Rule of Evidence 801.  The defendants' own emails are admissible against each of them individually as party-opponent statements under Rule 801(d)(2)(A).  The emails from a defendant that relate to the conduit contribution conspiracy, or its coverup, are admissible against each co-defendant as co-conspirator statements under Rule 801(d)(2)(E).

## II.      PRIOR RULINGS AND RELATED EVIDENCE AT TRIAL

On July 20, 2021, the Court issued a Memorandum Opinion and Order addressing venue and, in the context of defendant El-Saadi's motion to sever, the overlapping layers of overt acts, potential witnesses, and relevant evidence between Count One and Count Thirteen of the Indictment. Dkt. 128.  The government will rely on the Court's rulings in both respects to prepare its opening statement and subsequent presentation of evidence to the jury.  We discuss both items in turn.

### A.      Venue

At trial, "[t]he government bears the burden of establishing by a preponderance of the evidence that venue is proper with respect to each count charged against a defendant."  Dkt. 128 at 8 (internal citation omitted).  As to the counts alleging conduit contributions in violation of 52

U.S.C. §§ 30122 and 30109, "venue lies wherever the contribution was sent, received, or accepted." *Id*. at 16. As to the contributions to Political Committee 2, the government will prove that it was a joint fundraising committee that included Political Committee 5, which is based in the District of Columbia. This Court held, as to contributions to Political Committee 2 that were routed to Political Committee 5, venue is proper in the District of Columbia "to the extent that the government can prove at trial that the contribution was either received or accepted by Political Committee 5 in the District of Columbia." *Id*. at 24. Political committee representatives will testify that the committees processed and accepted defendants' conduit contributions in the District of Columbia.

### B.   Overlapping Conspiracies

George Nader, who was acting as a representative of the UAE, provided funds to Khawaja for purposes of making conduit contributions. Khawaja then transferred a portion of those funds to Diab, El-Saadi, and others to facilitate conduit contributions.

Evidence of the transfer of the funds from Nader to Khawaja before Khawaja passed the funds to Diab and El-Saadi is "admissible to show the formation of the conspiracy and particularly the circumstances which led defendant[s] to join the conspiracy." *United States v. Simmons*, 431 F. Supp. 2d 38, 58 (D.D.C. 2006), *aff'd sub nom. United States v. McGill*, 815 F.3d 846 (D.C. Cir. 2016). Evidence relevant to proving a conspiracy is admissible, "regardless of when the acts were committed." *Id*. (internal quotation omitted); *see also United States v. Diaz*, 878 F.2d 608, 613– 15 n.2 (2d Cir. 1989) ("[O]therwise relevant evidence is not rendered inadmissible because it relates to events falling outside the time frame alleged in an indictment."). The fact that evidence "precedes the date of the inception of the conspiracy charged in the indictment" does not preclude its admission. *Diaz*, 878 F.2d at 616. Further, "[e]vidence of behavior antedating the period covered by the indictment is generally admissible as bearing on the existence and purpose of the

conspiracy and the significance of later behavior." *United States v. Bates*, 600 F.2d 505, 509 (5th Cir. 1979) (citations omitted). As this Court has stated, "the facts underlying the Count 1 conspiracy explain the origins and purpose of the Count 13 conspiracy." Dkt. 128 at 27. The fact that Nader provided the funds that Diab and El-Saadi ultimately transferred in straw contributions is therefore relevant and admissible at trial, and the government intends to preview this evidence to the jury in its opening statement.[7]

## III.   POTENTIAL LEGAL ISSUES

The following legal issues may arise at trial.

### A.   Character Evidence

Under the Federal Rules of Evidence, a defendant may present character evidence via reputation or opinion testimony regarding lawfulness and often regarding truthfulness, and the prosecution is allowed to rebut the same. Fed. R. Evid. 405(a). However, "[e]vidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait." Fed. R. Evid. 404(a). Consequently, when character is not an essential element of the offense, character evidence may only be presented through "testimony as to reputation or by testimony in the form of an opinion." Fed. R. Evid. 405(a); *see also United States v. Brown*, 503 F. Supp. 2d 239, 241 (D.D.C. 2007) ("[U]nless the case is one 'in which character or a trait of character of a person is an essential element of a charge, claim, or defense,' in which case a defendant may provide proof of 'specific instances of that person's conduct,' *see* Fed. R. Evid. 405(b), a defendant may only offer character evidence via opinion or reputation testimony."). A defendant may not provide evidence of possessing a generally good

---

[7]     To the extent that, during the government's case-in-chief, the defendants object on Federal Rule of Evidence 403 grounds that the Count 1 conspiracy presents a risk of unfair prejudice, this Court has held that "limiting instructions, if necessary, can address any risk of prejudice related to the first conspiracy's foreign ties." Dkt. 128 at 28.

character.  *See United States v. Camejo*, 929 F.2d 610, 613 (11th Cir. 1991) (court properly excluded proffered testimony "to portray [defendant as having] a good character").

Likewise, a defendant may not offer evidence of specific instances of good conduct.  *See Brown*, 503 F. Supp. at 242 (defendant's prior commendations and awards were "not 'background evidence' because the only purpose for offering such information would be to portray a defendant in a positive light" and "defendant's family composition [was] . . . properly excluded by this circuit on the grounds that such information constitutes character evidence irrelevant to the charges in a particular case that would be used only to make the defendant appear more sympathetic"); *United States v. Washington*, 106 F.3d 983, 999-1000 (D.C. Cir. 1997) (defendant police officer's commendations properly excluded because they were neither "pertinent" nor probative of an essential element); *United States v. Cudlitz*, 72 F.3d 992, 996 (1st Cir. 1996) ("Good character evidence was improper in form since the rules limit the proponent to offering an opinion or reputation witness rather than testifying to specific instances or events."); *United States v. Ellisor*, 522 F.3d 1255, 1270-71 (11th Cir. 2008) ("specific acts of good character were inadmissible under [the] Rules"); *United States v. Marrero,* 904 F.2d 251, 259-60 (5th Cir. 1990) (court properly excluded evidence that defendant did not overcharge in certain instances because such evidence is improper under Rule 405 as specific acts of good character).

Similarly, a defendant may not offer evidence of the absence of bad conduct.  *United States v. Scarpa*, 897 F.2d 63, 70 (2d Cir. 1990) ("defendant may not seek to establish his innocence . . . through proof of the absence of criminal acts on specific occasions"); *United States v. O'Connor*, 580 F.2d 38, 42-43 (2d Cir. 1978) (in bribery case, inappropriate to permit testimony that the charged inspector honestly performed his duties in specific instances); *United States v. Barry*, 814 F.2d 1400, 1403 (9th Cir. 1987) ("testimony as to the lack of prior bad acts is, in essence, testimony

as to multiple instances of good conduct, and its admission would appear to violate a strict reading of Rule 405(a)," quoting *Government of Virgin Islands v. Grant*, 775 F.2d 508, 512 (3d Cir. 1985) ("testimony that one has never been arrested is especially weak character evidence; a clever criminal, after all, may never be caught")); *Hiszog v. United States*, 226 F.2d 561, 565 (9th Cir. 1955) ("defendant cannot establish his innocence of crime by showing that he did not commit similar crimes on other occasions"); *United States v. Morgan*, No. CRIM. 00-375, 2000 WL 1622748, at *10 (E.D. Pa. Oct. 20, 2000) (excluding evidence of lack of criminal history because: (1) "whether the defendant has broken the law before has virtually no bearing on whether  he did so this time," (2) "such evidence may mislead the jury," and (3) the evidence may "cause the jury to be overly sympathetic"); *see also* Fed. R. Evid. 404(a).

   **B.     Discovery Issues**

   To the extent that any discovery-related issues arise at trial, the United States requests that those matters be addressed outside the presence of the jury.  Discovery-related comments are irrelevant to the jury's function and may create the impression that one party has suppressed information to seek an unfair tactical advantage at trial.  *See United States v. Dochee*, 08-CR-108–4, 2009 WL 102986, *1 (N.D. Ill. Jan. 15, 2009) (excluding comments on discovery because "commentary on discovery matters by either party in the presence of the jury could create the impression that the opposing party is withholding information").  More to the point, all discovery-related issues can easily be addressed outside the presence of the jury with no resulting prejudice. *See United States v. Cochran*, 4:13-CR-022-HLM-WEJ, Dkt. 44 at 16 (N.D. Ga. Feb. 25, 2014) (the "Court will require the Parties to take up any comments or issues relating to discovery outside the presence of the jury"); *United States v. Gray*, 2:07-CR-166, 2010 WL 1258169, *3 (N.D. Ind. Mar. 26, 2010) (granting "motion to preclude requests of discovery from witnesses or opposing counsel, moving the court for such discovery or otherwise commenting on discovery matters in

the presence of the jury.  Any necessary requests for or comments about discovery can be made outside of the jury's presence"); *see also Thompson v. Glenmede Trust Co*., No. 92-5233, 1996 WL 529693, at *2 (E.D. Pa. Sept. 17, 1996) ("the Court will not permit either party to refer to the discovery process in the presence of the jury at trial").  As a result, the United States requests that the Court require that all comments relating to discovery issues be made outside the presence of the jury.

### C.    Charging Decisions

The D.C. Circuit has recognized that the "Attorney General and United States Attorneys retain broad discretion to enforce the Nation's criminal laws."  *United States v. Stone,* 394 F. Supp. 3d 1, 10 (D.D.C. 2019) (internal quotations omitted); *accord United States v. Armstrong*, 517 U.S. 456, 464 (1996).  This authority "lies at the core of the Executive's duty to see to the faithful execution of the laws."  *Id*. (internal quotations omitted); *accord* U.S. Const. Art. II, § 3; *see* 28 U.S.C. §§ 516, 547.

As a general matter, "so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978); *accord United States v. Cespedes*, 151 F.3d 1329, 1332 (11th Cir. 1998); *see also United States v. Batchelder*, 442 U.S. 114, 124 25 (1979) ("Selectivity in the enforcement of criminal laws is, of course, subject to constitutional constraints.").  The claim that others "could have been charged but were not" is not a factual defense that bears upon whether the defendant is guilty of the crimes charged by the Grand Jury. *United States v. Smith*, 231 F.3d 800, 807 (11th Cir. 2000).  Evidence that some other individual is

currently uncharged has no probative value to the issues at trial and serves only to confuse or mislead the jury. *See* Fed R. Evid. 402 and 403.

Judged under these legal principles, El-Saadi and Diab should be precluded from introducing evidence or making arguments regarding charging decisions made by the United States, including any argument that the charges in this case were politically motivated. *See United States v. Abboud*, 438 F.3d 554, 579 (6th Cir. 2006) ("[T]he defense of selective prosecution is a matter that is independent of a defendant's guilt or innocence, so it is not a matter for the jury.") To the extent that El-Saadi and Diab seek to present evidence or arguments: (1) that the charges in this case were politically motivated; (2) that other individuals have not been charged for related conduct; or (3) that it is unfair that El-Saadi and Diab have been charged, while other individuals involved in criminal conduct remain uncharged, such evidence is irrelevant, inadmissible, and only serves to divert the jury's attention to matters unrelated to defendants' guilt or innocence.

Respectfully submitted,

COREY R. AMUNDSON
Chief, Public Integrity Section
Criminal Division
U.S. Department of Justice

By:    */s/Jolee Porter*
Victor R. Salgado (D.C. Bar No. 975013)
Michelle K. Parikh (D.C. Bar No. 1044532)
Jolee Porter (N.Y. Bar No. 4909362)
Trial Attorneys
Public Integrity Section
Criminal Division
U.S. Department of Justice

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this date, I electronically filed the foregoing pleading with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the attorneys of record for the defendant.


Dated: November 29, 2021          */s/Jolee Porter*
                                       Jolee Porter
                                       Trial Attorney
                                       Public Integrity Section
                                       Criminal Division
                                       U.S. Department of Justice